WM. CAMERON & CO., Inc., v. McSWEEN et al.†

(Court of Civil Appeals of Texas. April 4, 1911. Rehearing Denied April 27, 1911.)

1. DEATH (§ 14*) —RAILROADS — CAUSE OF DEATH.

Under Rev. St. 1895, art. 3017, § 1, giving a right of action for injuries resulting in death caused by employés or agents of the owner of a railroad, the owner is not liable unless the negligence occurred in or was directly connected with operating the road.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 16; Dec. Dig. § 14.*]

2. DEATH (§ 14*) — RAILROADS — CAUSE OF DEATH—"OPERATING THE ROAD."

Any negligence of a physician employed by a lumber company to treat its tram railroad employés' families in failing to attend a patient more promptly cannot be regarded as negligence in operating the road within Rev. St. 1895, art. 3017, § 1, giving a right of action for death caused by negligence of the employés or agents of a railroad company.

[Ed. Note.—For other cases, see Death, Cent. Dig. § 16; Dec. Dig. § 14.*

For other definitions, see Words and Phrases, vol. 8, p. 7738.]

3. MASTER AND SERVANT (§ 278*)—MEDICAL ATTENDANCE — NEGLIGENCE — EVIDENCE — SUFFICIENCY.

In an action against a lumber company for negligence of its physician in attending plaintiff's wife, under a provision in plaintiff's contract of employment that, in consideration of

---

certain deductions from his salary the employer would furnish medical attendance to the servant and his family, evidence *held* insufficient to show that the physician was negligent in failing to give prompt attention.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954–972; Dec. Dig. § 278.*]

Appeal from District Court, Tyler County; W. B. Powell, Judge.

Action by A. E. McSween and another against William Cameron & Co., Incorporated. Judgment for plaintiffs, and defendant appeals. Reversed and rendered.

Sleeper, Boynton & Kendall and J. A. Mooney, for appellant. V. A. Collins and Joe W. Thomas, for appellees.

PLEASANTS, C. J. This suit was brought by A. E. McSween and Edna Lee McSween, the surviving husband and minor daughter of Mrs. Rachel McSween, against the appellant and Dr. M. F. Bledsoe to recover damages for the death of Mrs. McSween, which it is alleged was caused by the negligence of the defendants.

The substance of the pleadings and the result of the suit are correctly stated in appellant's brief as follows:

It is alleged in the petition of the plaintiffs that defendant, Wm. Cameron & Co., Incorporated, owned and operated at the town of Rockland, in Tyler county, a steam sawmill, and was engaged in the manufacture and sale of lumber, and also owned, maintained, and operated a tram railroad, extending into Angelina county, over which its trains, cars, and trucks were run and operated, and over which said roads logs and men were transported to and from said mill to "front" and at intermediate points along the road; that, in connection with and incident to said sawmill, logging, and transportation business, the defendant company maintained for its employés, of whom A. E. McSween was one, a hospital department, whereby it agreed with them to provide and furnish them with a physician and medicines for the sick and injured employés and the members of their families, and charged such employés therefor the sum of $1.25 per month, and that defendant M. F. Bledsoe was employed by the defendant company as physician and surgeon, and said Bledsoe by his agreement with said defendant company was to look after and treat the sick and injured employés and their families, and provide medicines to them when necessary, for which services he received from the defendant company a price agreed on by them, but unknown to the plaintiffs, and that the defendant company derives a profit from said contract; that plaintiff relied upon said contract with said defendant company for medical treatment, and consented to the deducting of said sum of $1.25 per month from his wages. They also alleged that such agreement and understanding existed on the 7th day of March, 1909, at which time plaintiff A. E. McSween was employed by defendant corporation as track layer, and that on the evening of said date Mrs. Rachel McSween, wife of plaintiff A. E. McSween and mother of plaintiff Edna McSween, was taken sick, and that said Dr. Bledsoe was notified of the fact and requested to attend and treat her, which he failed and refused to do without cause; that he promised to attend and treat her the next day, early in the morning, and plaintiff relied upon the promise, and did not attempt to secure other medical attention, but said Bledsoe failed and refused to come as promised the next morning, and failed and refused to attend her until the morning of March 9, 1909, when he found her in a dying condition and beyond the help or aid of relief, and that she died about noon of said last-mentioned date, and that her death was directly caused by defendant's neglect and carelessness in failing to furnish her medical and surgical attention within a reasonable time.

The petition contains many other allegations in respect of the negligence of the said Bledsoe as being the negligence of the defendant Wm. Cameron & Co., Incorporated, and setting out more specifically the agreement in respect to medical treatment, etc., between the defendant company, the said Dr. Bledsoe, and employés of defendant company, and the loss and damages to plaintiffs on account of the death of said Mrs. McSween. The defendants Wm. Cameron & Co., Incorporated, and Dr. M. F. Bledsoe, filed separate answers. Dr. Bledsoe answered by general demurrer and general denial, and by way of special answer averred that on or about the 1st of September, 1903, he was engaged in the practice of medicine at Rockland, and, after considerable discussion, an understanding and agreement was arrived at between himself and said Wm. Cameron & Co., Incorporated, and the said employés of the mill at Rockland, whereby the timekeeper for Wm. Cameron & Co., Incorporated, should deduct from the wages of each married man among said employés the sum of $1.50 each monthly and from each single man the sum of $1 monthly, and credit the same to an account in the name of the defendant Bledsoe on the books of said Wm. Cameron & Co., Incorporated, and that all sums of money so deducted from the wages of said employés, less 5 per cent. to be paid to the timekeeper for his services in the matter, were to be paid monthly to defendant Bledsoe, in consideration of which he agreed to supply each of said employés and mill hands and their families reasonable medical attention and proper medicines, which understanding and agreement continued in force until about the 1st of December, 1907, when the mill was shut down; that afterwards, on

or about the 15th day of September, 1908, when the sawmill was again in operation, the said arrangement was resumed with this modification, however, that the timekeeper deducted monthly from the wages of each married man the sum of $1.25 and each single man the sum of 75 cents, which was credited to an account in favor of Dr. Bledsoe on the books of Wm. Cameron & Co., Incorporated, and paid to him monthly, but no deductions were made for the services of the timekeeper, the whole of said sum of money being paid over to said Bledsoe monthly for his services to said employés and their families, and that said plan was in operation in the month of March, 1909; that about 12 o'clock at night on March 7, 1909, one George Blake applied to Bledsoe to visit and give medical attention to Mrs. McSween, wife of plaintiff, A. E. McSween, who resided some five or six miles from defendant's residence at Rockland; that said Bledsoe was at the time ill and suffering from sick headache, and had no way to make said visit, except on horseback, and was not then in physical condition to make said visit in that way, and so informed said Blake, but told him that he would go out next morning on the caboose at 6 o'clock, whereupon said Blake informed said Bledsoe that he would go and get Dr. Stewart to go out and see Mrs. Rachel McSween, wherein said Bledsoe acquiesced, it being the custom, when said Bledsoe was unable to attend the mill operatives, for them to secure the services of some other physician, who was paid out of the funds provided for, as herein stated; that said Bledsoe received no further request to attend Mrs. McSween, and was not further notified as to her condition until Tuesday morning, March 9th, about 6 o'clock, when said Blake came to said Bledsoe at Rockland and again requested him to go out and see Mrs. McSween, whereupon he immediately went out on the log train, and gave her all reasonable attention from that time on, notwithstanding which she died. Defendant, Wm. Cameron & Co., Incorporated, also answered by general demurrer and general denial, and by special answer set up the arrangement between Dr. Bledsoe, its employés, and itself in respect to the employment of Dr. Bledsoe as physician for the employés of said mill as set out in the answer of said Dr. Bledsoe.

The court overruled the general demurrer of Wm. Cameron & Co., Incorporated, to the plaintiffs' petition, and on a trial before a jury the court instructed them that, under the law and facts of the case, Dr. Bledsoe was not liable to plaintiffs and to bring in a verdict for him, but charged the jury upon the issues as set out in the plaintiffs' petition as against the defendant Wm. Cameron & Co., Incorporated, and the jury returned a verdict in favor of the plaintiffs against defendant Wm. Cameron & Co., Incorporated, for the sum of $5,000, apportioning $1,000

thereof to plaintiff A. E. McSween and $4,000 to the plaintiff Edna McSween.

By its first assignment of error appellant assails the ruling of the trial court refusing to sustain a general demurrer to plaintiffs' petition, and by the second assignment complaint is made of the refusal of the court to instruct the jury to return a verdict in favor of the defendant. The negligence charged against appellant in the petition generally is the negligence of Dr. Bledsoe in failing to attend and minister to Mrs. McSween when called so to do by appellees, and appellant's liability is predicated entirely upon the claim that it is responsible for the alleged negligence of its employé Dr. Bledsoe in failing to give Mrs. McSween proper medical attention. The only allegation of the petition specifically charging appellant with negligence is as follows: "That defendant, Wm. Cameron & Co., Incorporated, was negligent and careless in the employment of a physician and surgeon, and one to have charge of the medicines and surgical apparatus, in that Dr. Bledsoe, whom it did contract with and agree to plaintiffs, their wife and mother, Mrs. Rachel McSween, to furnish as physician and medical treatment, failed and refused and negligently acted in the premises, who by said agreement and contract between plaintiffs and defendant company was in duty bound and should have attended and treated Mrs. Rachel McSween, and that his failure and refusal to do so was the gross negligence and carelessness of defendant and breach of said contract with plaintiffs."

The testimony as to the contract between appellant and Dr. Bledsoe is as follows:

Mr. Bledsoe testified: "I heard the arrangements, as set out in the pleadings, read in regard to my fees. It is stated correctly there. The arrangements, as stated in the answers, are the only arrangements made between me and Wm. Cameron & Co., Incorporated, or the employés. The arrangement was made by one and all of us—we got together —these people wanted it and I rather liked it because I got my money regular, and, when Mr. West came in as manager, he was in favor of it. The manager preceding him didn't like that system, but Mr. West liked it, and it was understood that it should not be taken out of the salaries of the employés who had families in the woods, and who lived so far away from the track that I couldn't go out on that account. The employés knew of that arrangement. They all agreed to it and acquiesced in it. There has been a few cases where the check clerk didn't know where they lived, and, when they found out, they would come around and refund them the amount if they lived too far off. That is, people who lived three or four miles from the track, across the river. Some people lived all the way from 18 to 20 miles from Rockland. And some of the people who worked on the 'front' lived four or five miles

or three or four miles from the 'front' or from the railroad. Those living right on the railroad fees were taken out. My mode of reaching these people was just on the train. I hadn't any means provided for going out three or four miles from the track, unless I would get a horse. Sometimes I used him. When they lived in town I would treat them in town, but I didn't treat them when they lived too far off from the track. I just treated those who lived close to the track and those were the only ones who were supposed to pay any hospital fees." He further testified that, according to his agreement with appellant, it was his duty to treat the family of any man in the employment of the company from whom the medical fee was collected, and that appellee was in the employment of the company and had paid his fee.

J. R. West testified that he was manager of Wm. Cameron & Co., Incorporated, at Rockland, and had been there for a number of years; that they did not have the system of employing a physician and deducting pay from the wages of the employés when he went there, but they had trouble getting doctors to "the front," and many of the employés could not get doctors, and he discussed the matter with the employés. "The company made no money out of the fees; gave it all to the doctor, but, as it placed an extra duty on the timekeeper, 5 per cent. was allowed him, and the balance paid to the doctor, who furnished the medicine and treated the patients, and did the general practice. If a man lived too far out in the woods, did not deduct anything for him. At first and until December, 1907, married men paid $1.50 and single men $1. But the mills closed down in December, 1907, and did not resume until September, 1908. Then the fee was reduced to $1.25 for married men and 75 cents for single men, and the timekeeper was allowed nothing. It all went to the doctor. McSween made no objection to that arrangement. If Dr. Bledsoe was disabled or unable to give attention to the employés, they would get another doctor who would be paid out of the fund. Dr. Bledsoe had charge of our hospital department. He also had charge of the medicine. We never had any medicine. He furnished all of the medicine. We did not have any contract with him. We were to pay him this money as we got it in. He paid for the medicines himself. We carried none in the store. A man with a family would pay $1.25 a month which included medicine and medical attention. He would just go to Dr. Bledsoe like I would to any other practicing physician. There was just a general understanding between all the employés that this should be carried out in that way. I didn't expect any more of my employés than I did myself. I had to get him when I wanted him, and he always did my practice. Whenever any one wanted him, they had to go to him the same as any other

practicing physician. Wm. Cameron & Co., Incorporated, never made a cent of profit out of this arrangement with Dr. Bledsoe, and the employés received the benefit of Dr. Bledsoe's services, and Dr. Bledsoe was paid under this arrangement I have just spoken of, and every cent that was collected in this manner was turned over to him. The arrangement was made for the purpose that the employés of the company might have a man that they could always look to and as a benefit to the employés and their families as far as their health was concerned, and preserving their health and keeping the standard of their health up generally, and for the purpose of the money consideration because three or four visits of a doctor would take more than a year's fee that would be paid with the usual charge of visits and medicine. If a laboring man had any sickness, he couldn't pay the doctor's bills long." He also testified that Wm. Cameron & Co., Incorporated, are engaged in the business of manufacturing lumber and have a sawmill, and, in connection with same, they have a tram railroad or log road that goes out to what is called "the front," hauling logs about 18 miles. The company hauled its logs over this road and carried men backwards and forwards, and carried out what supplies the employés needed, and what the citizens out there bought at Rockland. The train consisted of a locomotive engine and cars, etc. No compensation was received for hauling citizens that were not employés or any merchandise or freight. The road was used as an accommodation to them, and the mill employés were carried out to work and brought in on the road.

George Blake testified: "He, A. E. McSween, lived about half a mile from the Wm. Cameron & Co.'s tram road. They hauled logs and most everything. Most everybody rides the train, and they carry groceries and dry goods out for the men. They claim the main line goes 14 miles and the switch engine goes about 20 miles. Main line makes three trips a day."

A. E. McSween testified: "I worked for the Wm. Cameron Lumber Company. In March, 1909, I was working in the woods on the track department laying steel. Will Creek was my foreman. I don't know how long I had been working on the section with the steel gang. They never asked me at any time who they should employ as doctor for the mill. They never said a word to me. Mr. West did not come to me and ask me if Dr. Bledsoe was all right. They just employed him and put him up to me. The Wm. Cameron & Co., Incorporated, did not ask me my permission to take that out of my wages."

There is also evidence showing that all of the employés of the appellant living along the line of its tram road were compelled to pay the monthly medical fee in order to retain their employment with appellant.

Upon the issue of the negligence of Dr.

Bledsoe in failing to give medical attention to Mrs. McSween, the undisputed evidence shows that George Blake, the messenger sent by appellee to summon Dr. Bledsoe, reached the doctor's home about 12 o'clock Sunday night, and informed him of Mrs. McSween's sickness and delivered appellee's request that he come to see her at once. The doctor informed Blake that he was sick and unable to attend the call that night, but would send medicine to relieve the patient and go to see her on the early train the next morning. Thereupon Blake informed the doctor that appellee A. E. McSween had instructed him not to bring medicine but to bring a doctor, and, if he could not get Dr. Bledsoe, to get Dr. Stewart, who lived in the same town and near Dr. Bledsoe. When Blake told him this, Dr. Bledsoe replied that he thought that would be best, and told Blake to go and get Dr. Stewart. Blake then left to go for Dr. Stewart, and Dr. Bledsoe heard no further in regard to the matter until Tuesday morning, when he was again sent for to see Mrs. McSween. He answered this call promptly, but, when he reached the patient, he found her in a dying condition, and could do nothing for her. If she had received proper treatment when she first became sick, her life would probably have been saved. No one informed Dr. Bledsoe that Blake had failed to get Dr. Stewart on Sunday night, and Dr. Bledsoe did not know that Stewart had not answered the call until Tuesday morning, but presumed he had. He testified: "I knew Dr. Stewart was satisfactory to him (McSween). He had practiced for him, and I felt perfectly satisfied that he had a doctor, and that it was not necessary for me to go to the woods on the early train the next day." He made no inquiry of Dr. Stewart to ascertain whether he had answered the call.

Blake testified: "I stated that Dr. Bledsoe told me that he could come out the next morning on the caboose. That was before I told him that I would go and get Dr. Stewart if he couldn't go that night. At the time he made the statement to me he didn't know at that time about the instructions I had from McSween to go get Dr. Stewart if he didn't go. I didn't tell him afterwards that I expected him on the train when I left there. I did not intimate to him that I would be expecting him on the train the next morning. I went to Dr. Stewart for the purpose of getting him to go. I believed Dr. Stewart would go that night. I wouldn't have asked him if I had not thought that he would have gone. I did not go to Dr. Bledsoe, and notify him that Dr. Stewart had not gone. I did not say anything to him."

Dr. Bledsoe testified: "Mr. Blake never came back to me the next day or that night or any other time to advise me whether Dr. Stewart had gone out or not. No one told me whether he had gone out there or not. I presumed he had. I did not go out on the first train the next morning because there was no necessity for me to go out on the first train. When I said I would go the next morning, Blake said that would not do, and he said he would go and get Dr. Stewart, and I felt relieved that I didn't have to go out on the 5:30 train. He said he would get Dr. Stewart to go out that night if I didn't go. I told him at first that I would go out the next day and did go (on a later train) and passed by in one-half or three-fourths of a mile from where Mr. McSween lived. I didn't see Mr. McSween or any one. I didn't hear any more from the case until the next Tuesday morning at 6 o'clock. I saw Mr. McSween the next day when he came to town at about 8 or 9 o'clock. I just saw him in passing down the street towards the store gallery where Dr. Stewart has his drug store or office, and it occurred to me that Dr. Stewart had been out there to see the lady and Mr. McSween had come in to get some medicine. Mr. McSween had the same opportunity to see me that I had to see him. I was about 30 steps from him. He didn't say a thing to me in connection with his wife's illness. I saw him that morning and supposed that Dr. Stewart had been out to see his wife, and that he had come in to report her condition, and I thought everything was all right or he would have come and told me so. Tuesday morning about 6 o'clock Mr. Blake came to see me and wanted me to go to see Mrs. McSween, and said she had never had a doctor and I got right on the engine. When he told me that, I got up and dressed hurriedly, and caught the first train and got out about 8 or 9 o'clock."

Appellee A. E. McSween testified that from what Blake told him he expected Dr. Bledsoe to come out on the early train Monday morning, and, when he failed to come, appellee went to town and got medicine from Dr. Stewart. He saw Dr. Bledsoe at a distance, but did not go to him or have any conversation with him, and did not send for him again until Tuesday morning.

Under the first assignment of error before mentioned, attacking the ruling of the trial court refusing to sustain the general demurrer to appellees' petition, stated in reversed order to that in which they are presented in the brief, appellant's contentions are in substance: First, that appellant is not, under the allegations of the petition, the proprietor or owner of a railroad as that term is used in section 1 of article 3017, Rev. Stat., giving a right of action for injuries resulting in death when such injuries are caused by the "unfitness, negligence or carelessness" of the servants or agents of such proprietor or owner; and, second, that if appellant under the allegations of the petition can be regarded as the proprietor or owner of a railroad, as that term is used in the statute before mentioned, the petition nevertheless fails to state a cause of action because the alleged negli-

gence of the agent Bledsoe was not the negligence of a servant or agent of the appellant in prosecuting its business of operating a railroad.

Under the second assignment, which assails the ruling of the trial court refusing to instruct the jury to return a verdict for the defendant, appellant makes the same propositions and contentions as applicable to the undisputed facts in evidence as those made under the first assignment before set out.

It is further contended under this assignment that there is no evidence to sustain the finding that Dr. Bledsoe was negligent in failing to attend Mrs. McSween more promptly, or that such negligence, if any, is shown by the evidence, was the proximate cause of Mrs. McSween's death.

[1] We think both the assignments should be sustained. If it be conceded that the evidence is sufficient to show a contract on the part of appellant to furnish medical attention and treatment for its sick or injured employés and their families, there is neither allegation nor evidence that it was guilty of any negligence in selecting and employing Dr. Bledsoe as its physician to treat its employés, and the only negligence submitted to the jury was the negligence of Dr. Bledsoe in failing to give prompt medical attention to Mrs. McSween.

Upon the case made by the pleadings and undisputed evidence the defendant can only be held liable for the death of Mrs. McSween by aid of the rule of respondeat superior. Such being the case made by the pleadings and evidence, no cause of action is shown unless appellant can be held to be the proprietor or owner of a "railroad" as that term is used in the article of the statute before mentioned. This court has held that a tram railroad operated by a lumber company for the purposes of conveying logs to the mill and taking its employés back and forth from the mill to their work in the woods was not a railroad in the purview of the statute giving a right of action for injuries resulting in death when such injuries are caused by the "unfitness, negligence or carelessness" of the servants or agents of the owner of a railroad "for the conveyance of goods or passengers." Ott v. Johnson, 101 S. W. 534; Halbert v. Lumber Co., 107 S. W. 592. In the cases of Cunningham v. Neal, 101 Tex. 338, 107 S. W. 539, 15 L. R. A. (N. S.) 479, and Receivers of Kirby Lumber Co. v. Loyd, 124 S. W. 903, our Supreme Court holds that the word "railroad" as used in the fellow servants act (Rev. Stat. art. 4560f) and the venue act (Laws 1901, p. 31) is not limited to commercial railroads or common carriers, but includes private and tram railroads operated only as an appurtenance to a private business. The word "railroad" as used in the statutes construed in these cases has no qualifying clause attached thereto, as in article 3017, above quoted, and, when the object and purpose of the statutes are considered, there is no reason for giving the word a limited or restricted meaning. These cases only go to the extent of holding that the word "railroad" used without any qualifying clause includes a private road used solely for private business purposes, as well as a railroad operated as a common carrier engaged in the transportation of freight and passengers for the public.

But in the case of Receivers of Kirby Lumber Company v. Owens, 120 S. W. 936, the Court of Appeals for the Fourth district held that a tram railroad operated by a lumber company and used only in connection with the private business of the company was a railroad in the purview of article 3017, and the company owning such railroad would be liable for the death of a person caused by the negligence of its servants. The Supreme Court refused a writ of error in this case. In the case of Receivers of Kirby Lumber Company v. Lewis, 125 S. W. 961, this court felt constrained to follow the holding in the Owens Case. A writ of error was also denied in the Lewis Case. The questions thus seem to be settled against appellant's contention, and we must so hold.

The writer cannot bring himself to believe that this is a sound construction of the statute. In designating the class of persons against whom a cause of action is given for injuries resulting in death caused by the unfitness, negligence, or carelessness of a servant or agent, the statute uses the following language: "The proprietor, owner, charterer (or) hirer of any railroad, steamboat, stage, coach or other vehicle for the conveyance of goods or passengers." It seems unreasonable to hold that, under this statute, a lumber company that used wagons for hauling its logs to its mill and carrying its employés to their place of work, or a farmer who used wagons for carrying his farm hands to his field and hauling his crop to market, or the owner of a milk wagon used for distributing milk to his customers, could be held liable for injuries resulting in death which were caused by the negligence of one of his servants or agents. But, if the owner of a railroad or steamboat used for private purposes only can be held liable under this statute for injuries caused by the negligence of a servant or agent and resulting in death, it necessarily follows that the owner of a wagon or other vehicle used for the private purposes before mentioned could be held to a like liability. Such construction, it seems to the writer, is contrary to the plain and unambiguous language of the statute, and therefore wholly unauthorized. As pointed out by Justice Williams in the case of Railway Co. v. Freeman, 97 Tex. 394, 79 S. W. 9, the difference between this statute and the Lord Campbell's act and the acts of the American States that have adopted the English act is obvious. "Those statutes fix the liability upon all persons without discrimination when

the death is caused by wrongful act, neglect, or default, such as would have given a cause of action to the person injured if he had lived, and make all masters and employers responsible for such misconduct of their ·servants or agents; while ours make none accountable for the misconduct of servants and agents except certain ones classified according to the business in which they are engaged." A reason why the Legislature may have thought it proper to fix this liability upon the owner of a railroad used as a common carrier, and not upon one used solely in the private business of the owner, is not far to seek. In the one case the number of persons exposed to danger from the negligence of the servants or agents is much greater than in the other, and it might reasonably be considered that the proper protection of the public would require that common carriers should be held responsible for deaths caused by the negligence of their servants or agents while no sufficient necessity existed to make the farmer, merchant, or millowner responsible for such deaths merely because he happened to own a railroad, steamboat, or other vehicle which he used in his private business for transporting his products or goods and carrying his employés to and from their work.

Conceding, however, that the statute gives a right of action for injuries resulting in death against the owner of a railroad used solely for private purposes when such death was caused by the negligence of the servant or owner of such railroad, the owner could not be held responsible unless the negligent act or omission of the servant occurred in or was directly connected with the business of operating the railroad. Railway Co. v. Freeman, 97 Tex. 394, 79 S. W. 9; Williams v. Traction Co., 107 S. W. 125.

[2] If, under the evidence of this case before set out, Dr. Bledsoe could be held to have been negligent in failing to attend Mrs. McSween more promptly, and as a proximate result the death of Mrs. McSween was caused, such negligence did not, under the allegations of the petition, nor as shown by the evidence, occur in the prosecution of appellant's business of operating a railroad, and had no direct connection therewith. The contract of appellant to furnish medical attention to its employés, if it was under such contract, was not essential or peculiar to its business of operating its tram road, but merely collateral thereto. While the contract to furnish medical treatment for its employés was beneficial to the business of the company generally, in that it tended to preserve and restore the health of any of its employés that might become sick or injured, it was not a part of, nor directly connected with, the business of operating its railroad, and therefore appellant cannot be held responsible for the death of Mrs. McSween, if her death could

be held, under the evidence, to have been caused by the negligence of Dr. Bledsoe, the agent of appellant in carrying out said contract.

[3] We are further of the opinion that, if the appellant could be held liable for the alleged negligence of its agent, Bledsoe, the jury should have been instructed to return a verdict for the defendant because the evidence fails to show that Dr. Bledsoe was negligent in not giving Mrs. McSween more prompt attention. The evidence before set out on this issue is undisputed, and no reasonable conclusion can be drawn therefrom than that the failure of Dr. Bledsoe to visit Mrs. McSween on Monday after he had been sent for on Sunday night was due to the fact that Blake, who was the messenger and agent of appellee, A. E. McSween, told Bledsoe, when informed by him that he was not well enough to respond to the call that night, but that he would send medicine and go out to see the patient in the morning, that this was not satisfactory to McSween, and that he, Blake, would get Dr. Stewart to attend the call. It is undisputed that it was then understood between Blake and Dr. Bledsoe that Dr. Stewart would be called to take charge of the case. Dr. Bledsoe was not informed of the failure of Dr. Stewart to respond to the call, and there was nothing in the circumstances shown by the evidence which required him in the exercise of ordinary prudence to make any inquiry in the matter. He had no reason to suspect that his services were still needed by Mrs. McSween, and, being under no duty to inquire in the matter he cannot be held guilty of negligence in failing to make any inquiry.

Our conclusion being that neither under the allegations of the petition nor upon the undisputed evidence in the record can appellant be held liable for the death of Mrs. McSween, it follows that the judgment of the court below should be reversed and judgment here rendered for appellant, and it has been so ordered.

Reversed and rendered.